IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICIA BROWN,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )      No.  06 C 813
                                         )
METROPOLITAN LIFE INSURANCE               )
COMPANY, et al.,                         )
                                         )
                    Defendants.          )

MEMORANDUM OPINION AND ORDER

Patricia Brown ("Brown") brings this action under a
provision of the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. §1132(a)(1)(B).[1]  Brown seeks reinstatement
of disability payments under that ERISA section pursuant to the
employee welfare benefit plan ("Plan") sponsored by Columbia
College, under which the College is the plan administrator and
Metropolitan Life Insurance Company ("MetLife") is the claims
administrator.[2]

Each of Brown and MetLife has now moved for summary judgment
under Fed. R. Civ. P. ("Rule") 56 and has relatedly complied with

---

[1] ERISA provisions are cited as "Section--," using the Title
29 numbering.

[2] MetLife acted as agent for and on behalf of the Plan in
collecting all of Brown's medical information, making all
determinations about her medical condition and communicating
those decisions to Brown.  Hence this opinion will refer to the
actions and decisions of the Plan and MetLife under the singular
"MetLife."

this District Court's LR 56.1.[3]  Their cross-motions are fully

briefed and ready for decision.  For the reasons stated in this

memorandum opinion and order, MetLife's motion is granted,

Brown's motion is denied and this action is dismissed.

## Summary Judgment Standard

Every Rule 56 movant bears the burden on her or its Rule 56

motion of establishing the absence of any genuine issue of

material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

(1986)).  For that purpose courts consider the evidentiary record

in the light most favorable to nonmovants and draw all reasonable

inferences in their favor (Lesch v. Crown Cork & Seal Co., 282

F.3d 467, 471 (7th Cir. 2002)).

As this Court has said in such cases as Coles v. LaSalle

Partners Inc. Disability Plan, 287 F.Supp.2d 896, 900 (N.D. Ill.

2003), those requirements--looking in opposite directions as they

do when applied to cross-motions for summary judgment--sometimes

present an insurmountable hurdle.  Moreover, the review of an

ERISA plan under the requisite deferential standard in the

---

[3] LR 56.1 facilitates the resolution of summary judgment
motions by highlighting the existence or nonexistence of factual
disputes. Where as here cross-motions are involved, each party
must submit both evidentiary statements and responses with
accompanying record citations.  Each of Brown and MetLife has
filed a statement pursuant to LR 56.1(a)(3), citing to the record
prepared by the Plan Administrator, and Brown has most recently
supplemented her original statement (this Court hereby grants her
motion for leave to do so).  Although each of the numbered pages
of the record bears the Bates stamp prefix "MET (Brown)," this
opinion cites to the record pages simply as "R.--."

summary judgment context creates a unique situation, for it requires a determination of the reasonableness of the Plan's decision even while all reasonable inferences are drawn in favor of Brown. But as the ensuing discussion reflects, those factors do not operate to defeat a decision here.

Statement of Facts

Brown began working for Columbia College in March 1989, and by June 2000 she was working in an accounts payable position (R. 170). On June 29, 2004 Brown had surgery performed on her back for a lumbar spine decompression, and she then experienced complications from that surgery that required her to seek treatment for an infection in the surgical wound in July 2004 (R. 177). To remedy the infection Brown had follow-up surgery for irrigation of her wound (R. 176). Brown was eventually diagnosed with a condition known as lumbosacral neuritis on October 7, 2004 (R. 174-75, 34).

For post-operative care Brown began to visit several doctors to treat her back pain and oversee her rehabilitation, including orthopedic surgeon Dr. Anis Mikhail, pain management specialist Dr. Ebby Jido and infectious disease specialist Dr. Shamse Tabriz (R. 161, 53). Throughout the early fall of 2004, Brown complained of pain across both her lower abdomen and back (R. 161, 53).

Notes from Brown's doctors memorializing their visits with

3

her reveal a conflict between their optimistic predictions for her imminent return to work and her own subjective complaints of persistent somatic pain.  For example, on November 1, 2004 Dr. Mikhail noted that Brown's "pain is significantly subsided now" and that "lateral X-rays of the lumbosacral spine today shows the hardware in good position as well as alignment of the spine" (R. 159).  Dr. Mikhail's notes set out his positive prediction that in four weeks' time "we will be able to send her to some work status using some restrictions" (id.).  That same day, however, Dr. Mikhail also noted Brown's subjective complaints of joint pain as well as her statement that she could not return to work because "[s]he feels she cannot sit for a long time, which is most of her job" (R. 159).

Four weeks later Dr. Mikhail again examined Brown, wrote with cautious optimism that Brown's infected wound is "well healed" and added:  "I told the patient she should be able to go back to work, but we will get the CT and MRI done first" (R. 57).  Again the doctor's notes contain references to Brown's subjective complaints of pain:  "She says she also has back pain" and "She does not feel she can go back to her job" (id.).

During the same period Dr. Tabriz ordered several tests, including a liver function panel and a test to measure Brown's inflammation levels, both of which came back normal (R. 59, 61).  In early 2005 an MRI of Brown's lumbar spine showed no disc

herniation or spinal stenosis, though there was mild annular bulging on one disc and there was some fluid in two of the bilateral facet joints (R. 133). Interpreting Brown's MRI results in March 2005, Dr. Jido observed that the MRI was not helpful in ascertaining an objective basis for Brown's pain (R. 76).

Brown also sought treatment from physical therapist Frank Vlk ("Vlk")(R. 139). Vlk noted that Brown ranked her low back pain at 5 or 6 out of 10 before his evaluation, but she decreased the pain factor to 3 out of 10 after the evaluation, indicating that the evaluation had provided some measure of relief (R. 139). Vlk's long-term goals for Brown, which echoed the optimistic predictions of her doctors, included enabling her to "perform normal daily activity with decreased limitation or deviation." In summary, his long-term prognosis for Brown achieving her treatment goals was "good" (R. 139).

As her doctors examined Brown throughout 2005, they observed that the basis of the back pain was unclear, as there appeared to be no objective cause (R. 49, 141). When Brown complained of shortness of breath in March 2005, her family physician Dr. Bruno ordered a battery of tests to rule out congestive heart failure (R. 129). Those tests came back normal. Similarly, a CT scan of Brown's abdomen and pelvis came back normal as well (R. 107).

In June 2005 Dr. Tabriz examined Brown and found that while

she was still complaining of back pain, her "lumbar spine wound [was] well healed," and he characterized the "etiology of ongoing pain" as "unclear" (R. 48). Consistently with the first of those findings, the June 2005 MRI of Brown's cervical spine showed a "mild degree of posterior and central protrusion of the discs" and a "mild effacement to the anterior part of the epidural sac," but on the whole her "[s]pinal cord per se is not remarkable" (R. 70). Brown's rheumatologist Dr. Hirsen also observed that Brown's x-rays revealed "trace swelling" and "very mild degenerative changes in the medical compartments" (R. 80), and also that "[t]he most recent lumbar spine MRI from January showed no evidence of infection" (R. 110).

Despite Brown's tenacious efforts to locate a doctor to find some objective reason why her lower back pain was so persistent, none of them was able to do so. In fact, the notes of Brown's rheumatologist from a June 2005 examination concluded that there was no evidence of inflammatory disease or infection and that "her problem is all due to continued degenerative changes and post-operative scar formation" (R. 81). Dr. Hirsen added, "I regret that I have nothing more dramatic to offer" (id.).

Meanwhile Brown had applied for long-term disability benefits in October 2004 because she said the complications from her back condition made it impossible for her to perform her job (R. 172-76). On her benefits application she listed her illness

as pain resulting from "surgery for degenerative scoliosis...with nerve compression" (R. 170) and said that "back surgery" prevented her from performing the duties of her job (R. 172).

Upon the initial review of Brown's claim, MetLife approved the payment of $1,790.14 per month effective December 26, 2004 (R. 006, 157-8). By March 2005 MetLife began to send written requests to Brown seeking additional medical information, including information from her visits with her treating physicians, current medications and treatment plan, test results and the prognosis for her return to work--even subject to any restrictions or limitations (R. 146, 127, 121, 199). Some of MetLife's written correspondence also requested the results of a functional capacity evaluation (R. 119).[4] While waiting for that additional material, in April 2005 MetLife extended Brown's benefits for an additional three months to enable her to get a second opinion as to treatment for her lower back pain (R. 10).

Despite MetLife's requests and the suggestion of Dr. Mikhail, Brown eschewed any FCE (R. 31). In fact, Dr. Mikhail's July 2005 notes state that he "recommend[ed] that the patient gets the functional capacity evaluation if she wants to be on

---

[4] Goetzke v. Ferro Corp., 280 F.3d 766, 770 (7th Cir. 2002) defines that diagnostic tool ("FCE") in these terms:

> Conducted by an independent physician evaluator, the FCE is a battery of physical tests that assesses whether an injured employee is able to return to work and in what capacity.

disability before I help her in filling out the paperwork" (R. 31). Though Dr. Mikhail also observed that Brown presented a new symptom--pain in her neck--and that she would like to have surgery done on her neck (R. 31), he had "never heard her complain about her neck," and he recommended against the surgery (R. 31). One month later Dr. Mikhail again examined Brown when she returned to his office for a follow-up visit "mostly for her neck pain" (R. 40). During that visit Dr. Mikhail observed no "significant nerve compression" in Brown's neck and stated she "walks with a normal gait," her surgical "wound is well healed," and even though she has "generalized pains with range of motion of her neck...she is neurologically intact distally in both upper and lower extremities" (R. 40).

Significantly, during that examination Dr. Mikhail opined that Brown "has reached maximum medical improvement" and recommended that Brown have a sedentary job pending a functional capacity evaluation (R. 40). Dr. Mikhail's final note said that Brown refused to "try physical therapy as it did not help her in the past" (id.).

On August 11, 2005 MetLife informed Brown that it had reviewed her claim for disability benefits and determined that the medical documentation she had submitted failed to support a finding that she was disabled under the Plan's definition (R. 94-95). Critically, MetLife found that Brown's submission lacked

"objective findings such as pain scale [and] Functional Capacity Evaluation" and that there was "no clear treatment plan, no diagnosis or rational [sic] for [her] inability to work at this time" (R. 95). In response Brown filed a timely appeal of MetLife's decision (R. 82).

Pursuant to the appeal process MetLife forwarded Brown's claim file to an independent physician consultant, Dr. Plunkett, who opined that patients such as Brown with histories of back ailments vary greatly and "some patients are able to hold limited work activities while others are totally functionally impaired" (R. 36). Dr. Plunkett said he was unable to "enumerate the specific limitations of [Brown] based on the information... available" without a functional capacity evaluation (id.). While he agreed that Brown's return to work would have to be subject to certain restrictions or limitations, he had to "defer to a functional capacity evaluation for a better opinion relative to the claimant's functional abilities"(id. at 37).

On September 20, 2005 Metlife upheld its termination of Brown's long-term disability benefits, concluding that "although [Brown] had some medical conditions, it appeared that [she] would have been able to perform the duties related to her own occupation" (R. 26-28). Left with no further avenues of administrative appeal, Brown filed this action on February 13, 2006.

<u>Standard of Review</u>

It is not disputed that the Plan is an "employee welfare benefit plan" as defined by Section 1001(1)(A) and that Brown is entitled to judicial review of the Plan's final decision here. Under the seminal teaching of <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), any such review is de novo unless the Plan has reserved discretion to its administrator to determine when benefits are due or to interpret the Plan provisions, in which event the court examines the record only to ensure that the decision was not arbitrary and capricious (<u>id</u>. at 109-11). To trigger such limited review a plan must "contain language that...indicates with the requisite if minimum clarity that a discretionary determination is envisaged" (<u>Herzberger v. Standard Ins. Co.</u>, 205 F.3d 327, 331 (7th Cir. 2000)).

Here the Plan explicitly grants MetLife the "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan" (R. 226). And the Plan immediately goes on to provide (<u>id</u>.):

> Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination is arbitrary and capricious.

As <u>Hackett v. Xerox Corp. Long-Term Disability Income Plan</u>, 315 F.3d 771, 773 (7th Cir. 2003) instructs, that "arbitrary and

capricious" standard is the proper measure of review when as here the ERISA Plan gives its administrators discretionary authority over benefit determinations. That means a court must not overturn the Plan's decision if, as <u>Hess v. Hartford Life & Accident Ins. Co.</u>, 274 F.3d 456, 461 (7th Cir. 2001)(internal citations and quotation marks omitted) puts it:

> (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

To summarize the operative test in slightly different language, this Court must not set aside the Plan's decision so long as it "is based on a reasonable interpretation of the relevant plan documents" (<u>O'Reilly v. Hartford Life & Accident Ins. Co.</u>, 272 F.3d 955, 960 (7th Cir. 2001)(internal quotation marks omitted)). To that end "we do not ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority. Instead, the only question for us is whether the administrator's decision was completely unreasonable" (<u>Kobs v. United Wis. Ins. Co.</u>, 400 F.3d 1036, 1039 (7th Cir. 2005)(citation omitted)). And in another variation on the same theme, courts are charged with determining whether administrators have given a "full and fair assessment of claims" as well as a "clear communication to the claimant of the specific

reasons for benefit denials" (<u>Black & Decker Disability Plan v.
Nord</u>, 538 U.S. 822, 825 (2003)(internal quotation marks
omitted)).

This opinion could well end here. When its <u>Statement of
Facts</u> is placed alongside the just-framed set of yardsticks,
Brown has indisputably fallen far short of creating a material
issue of fact that could label MetLife's action as even
approaching an "arbitrary and capricious" level. This Court will
nevertheless go on to examine in detail Brown's vain efforts to
escape that inevitable conclusion.

Brown's Contentions

In her effort to surmount the just-described high hurdles,
Brown advances several arguments--all of which prove unavailing:

1. Brown first contends that MetLife arbitrarily
ignored portions of its outside consultant's report, which
she alleges demonstrated that her condition was disabling.

2. Next, she claims that MetLife failed to find that
her condition had improved by July 2005, yet it still
terminated her benefits.

3. Third, she argues that MetLife failed to account
for all of her myriad ailments, including her neck pains and
her knee and hand arthritis.

4. Finally, she claims that MetLife misapplied the
Plan's definition of disability when it decided she could

return to work and perform the duties of her occupation. As the ensuing discussion shows, none of those contentions suffices to overturn MetLife's decision as either arbitrary or capricious.

As to Brown's first argument, MetLife's final termination letter stated that Dr. Plunkett found Brown "had an extensive and involved medical history including a long history of spinal fusion with infection," but also that "there were no objective findings that would support [her] functional limitations other than [her] long and involved history of spinal disease and ongoing pain complaints" (R. 27). As it was required to do, MetLife balanced the competing tensions inherent in Brown's claim and Dr. Plunkett's report: Brown's undisputed history of debilitating and painful back ailments as against the objective information that she was recuperating steadily, so that she could return to work with proper accommodations.

Thus, even while Dr. Plunkett acknowledged both Brown's condition--failed back syndrome--and its potential to cause "significant limitations in terms of [her] activities of daily living and ability to hold regular job activity" (R. 36), he ultimately reconciled that tension by agreeing that Brown could return to a sedentary job so long as certain restrictions were applied, including "no lifting more than 50 pounds, limited climbing" (R. 36). Dr. Plunkett also pointedly stated that "a

functional capacity evaluation for this claimant would have been helpful to determine exactly what she is capable of performing and what she is not capable of performing" (R. 36)--and it will be remembered that despite repeated requests from both her own treating physician Dr. Mikhail and MetLife, Brown did not provide such an evaluation, a failure that in turn contributed to MetLife's decision to terminate her benefits.

Under the Plan Brown was eligible to continue receiving benefits only if she provided objective medical evidence establishing her inability to perform the duties of her job (see R. 213). For that purpose the onus was on Brown to provide "proof of continuing Disability," and the Plan forewarned her of the consequences of failing to do so: "If you do not provide satisfactory documentation within 60 days after the date we ask for it, your claim may be denied" (R. 213). As early as March 1, 2005 MetLife asked Brown to provide it with her treatment plan and any restrictions and limitations, as well as her prognosis for returning to work (R. 148). Then on July 5 MetLife specifically requested the results from a functional capacity evaluation (R. 121), which Brown failed to provide within the 60-day limit specified by the Plan (see R. 26).

Under those circumstances it surely was not "completely unreasonable" (Kobs, 400 F.3d at 1039) for MetLife to determine that Brown could return to work at her sedentary job. According

to the job description, Brown would not be required to lift more than 50 pounds or to climb in order to perform the duties of her occupation. It was reasonable for MetLife to find that as long as the medically-sanctioned restrictions and limitations were followed, Brown would nevertheless be capable of performing the duties of her occupation (R. 171). In fact, Columbia College's Controller Ann Kennedy ("Kennedy"), who was familiar with Brown's position, completed a worksheet that detailed the number of hours Brown's position would require her to grasp, use her head and neck in various positions, sit, stand, walk, twist and use her hands repetitively (R. 171). By referring to that worksheet while evaluating Dr. Plunkett's report, MetLife reasonably determined that Brown could return to her position so long as her limitations were accommodated. Lastly, Brown's first argument fails to account for all of the other materials that MetLife reviewed before reaching its final decision.

In Brown's second contention she consistently claims that her medical records do not evidence improvement in her back conditions--the lumbosacral neuritis and her post-surgical infection. But express statements in her doctors' notes belie that claim. Her own treating physicians opined that Brown's condition was much improved: Thus Dr. Mikhail stated on August 15, 2005 that Brown "has reached maximum medical improvement, and I would place her [in a] sedentary job" (R. 40). Dr. Mikhail

further opined that Brown's wound was "well healed" and advocated her return to work as early as December 2004 (R. 57).  For a patient whose initial submission to MetLife claimed that complications from back surgery prevented her from performing the duties of her job (R. 172), the ensuing opinion of her treating physician that she had reached "maximum medical improvement" significantly bolsters MetLife's decision.

Indeed, it is particularly telling that Brown's own treating physician offered his opinion that she could return to work as early as seven months before MetLife terminated her benefits.  As Leipzig v. AIG Life Ins. Co., 362 F.3d 406, 409 (7th Cir. 2004) has recognized, "[m]ost of the time, physicians accept at face value what patients tell them about their symptoms; but insurers...must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."  Even on the assumption that Dr. Mikhail accepted Brown's subjective complaints at face value, he still found that she was capable of returning to work in a sedentary position.  To the same effect Dr. Bruno, another one of Brown's own doctors, stated on June 30, 2005 that "[t]here is no evidence of infection based on the appearance of the x-rays" (R. 80).  In sum, it is an understatement to say that MetLife was not arbitrary in viewing the medical records as adequately evidencing Brown's improved

physical health.

Next, Brown's third contention--that MetLife failed to account for all of her myriad ailments, including her neck pains and her knee and hand arthritis--fails for several reasons. As an initial matter, Brown's disability application, in response to the request for a description of her subjective symptoms, read "severe low back pain," (R. 174), and the later doctors' evaluations detailed the progress of her lumbosacral neuritis and the post-surgical infection in her back (see R. 57, 80). Hence MetLife's focus on the healing process of Brown's back maladies in its decision cannot even arguably be labeled as arbitrary.

As for Brown's other ailments, Dr. Hirsen reported on June 13, 2005 that since her surgery and infection she "had continued lower back pain" as well as "neck pain which radiates to the fingers down the upper extremities. These are her two worst areas of pain" (R. 109). Brown's family physician, Dr. Bruno, examined her just 17 days later and specifically stated (R. 80): "Today [Brown] states her main problem is low back pain radiating down the lower extremities. She has only mild pain in the hands and knees and feels this is not a significant problem." Dr. Bruno also wrote that "[t]he clinical exam shows a question of trace swelling in the MCP joints of the hands. There is no other inflammation" (id.).

In sum, it was entirely reasonable for MetLife, upon reading

Dr. Bruno's report, to have determined that the "mild pain" in Brown's hands and knees was not likely to preclude her from sedentary work. As of June 2005 her only reports of pain to her family physician were of her low back pain--she did not even mention neck pain. And finally, there was no evidence of inflammation, further corroborating MetLife's decision that Brown could return to work.

As for Brown's final contention, her argument can best be described as hard to follow. Brown's Mem. 3-4 points to this definition in the Plan (R. 194):

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and due to your inability to perform the duties of your Own Occupation you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy.

Relatedly the Plan does on to define "Own Occupation" as (R. 195):

> the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

In those terms Brown's principal objection seems to be that MetLife described her job as sedentary in nature and, according to Brown, determined only that she could generally perform sedentary work, rather than that she was able to return to her specific position with Columbia College. As Brown would have it,

MetLife impermissibly equated her position as an Accounts Payable Specialist with sedentary work in general and then leaped to the arbitrary conclusion that she could perform the duties of her previous occupation.

But that argument ignores the fact that MetLife examined Brown's medical file in conjunction with Kennedy's specific description of Brown's job.  That description detailed exactly how many hours per day Brown's position would require her to perform a host of physical tasks (R. 171).  And that exhaustive catalog of the job's physical demands plainly shows that Brown's position was completely sedentary, as fully 7 to 8 hours of the workday Brown was required to sit, as contrasted with no hours at all that she would be required to stand, walk, bend over, climb, crouch, stoop, kneel or balance (id.).

Moreover, Dr. Plunkett's report agreed that Brown should be restricted to lifting no more than 50 pounds and to climbing only occasionally (R. 36), as well as recommending that her walking and standing be limited (id.).  All of his recommendations are fully consistent with the job description form completed by Kennedy (R. 171).  In short, it was neither arbitrary nor capricious for MetLife to determine that Brown could return to her former position.

At the risk of repetition, Brown has failed to present any evidence at all to suggest that MetLife's decision was "downright

unreasonable" (the standard reconfirmed in <u>Davis v. Unum Life</u>
<u>Ins. Co. of Am.</u>, 444 F.3d 569, 576 (7th Cir. 2006)).  Although to
be sure such cases as <u>Hackett</u>, 315 F.3d at 774 teach that the
standard is not a "rubber stamp" of the administrator's decision
and that "deference need not be abject," here the record shows
that MetLife reviewed all of the medical data from Brown's
numerous doctors and specialists and requested additional
objective data about her pain and treatment plan on several
occasions.  By engaging in that exhaustive process to reach a
reasoned decision on Brown's claim, MetLife has demonstrated that
it "articulated a rational connection between the facts found,
the issue to be decided and the choice made," as required by
<u>Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability</u>
<u>Plan</u>, 378 F.3d 669, 680 (7th Cir. 2004)(internal quotation marks
omitted).

     Because MetLife unquestionably engaged in the deliberative
process and communicated the full results of that process to
Brown, and because its decision was solidly grounded in the
medical evidence and the language of the Plan itself, the
requisite standard of review compels a decision in MetLife's
favor.

<u>Conclusion</u>

     Brown has been unable to create a genuine issue of material
fact, even with the benefit of all reasonable favorable

inferences, to suggest that MetLife's decision was arbitrary and capricious. Hence MetLife is entitled to a judgment as a matter of law. This Court affirms MetLife's decision rejecting Brown's long-term disability claim and grants summary judgment in favor of MetLife and against Brown. Brown's cross-motion for summary judgment is of course denied, and this action is dismissed.

_____

Milton I. Shadur
Senior United States District Judge

Date:  November 22, 2006